UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

LARRY THOMAS and
SANDY THOMAS, his wife,

      Plaintiffs,


v.                       Civil Action No. 2:16-cv-03892


NORTHWEST CONCRETE PRODUCTS, INC.
d/b/a NORTHWEST LOGISTIC HEAVY HAUL,
STEPHEN MCCUTCHEON, and
JEFFREY GLASS,

      Defendants.


<u>MEMORANDUM OPINION AND ORDER</u>


Pending are the plaintiffs' motion for summary judgment on all of their claims and the defendants' motion for partial summary judgment which challenges some claims individually. Both motions were filed on May 7, 2018.


I.   <u>Background facts</u>

This action arose from a traffic accident that occurred on the morning of Tuesday, May 13, 2014, in which plaintiff Larry Thomas ("Thomas") was injured. At the time of these events, Thomas was driving a tractor trailer for his employer Brenntag while proceeding northbound on I-79. Ex. 7 to Pffs. Mot., Thomas Statement and Drawing ("Thomas Statement"); Pffs. Memo. at 2. He had just passed the Big Chimney exit north

of Charleston, West Virginia, when his vehicle, which had a height of 13'6" and did not require a special permit, struck and brought down an Appalachian Electrical Power Co. ("AEP") cable that was sagging below its established height.  Id.  Moments after he stepped out onto the roadway "to assess the damage," Thomas suffered injuries from that cable when it was hit by a passing red pickup truck and entangled him.  Id.

The electric cable sagged so dangerously low as a result of an immediately preceding traffic occurrence that involved the defendants, namely, the trucking company Northwest and its two employees, Stephen McCutcheon and Jeffrey Glass, who were driving separate vehicles.  Deposition of Austin Helm ("Helm Dep.") at 46.  Unlike Thomas who drove locally, the Northwest drivers were hauling their wares over a long distance and were driving, also north on I-79, with single trip permits for oversized loads.  Deposition of Stephen McCutcheon ("McCutcheon Dep.") at 15.  In particular, the height of their loads was 15'6" and the width was 12'.  Deposition of Jeffrey C. Glass ("Glass Dep.") at 13.  McCutcheon drove his oversized load in front, and Glass followed.  Id. at 20.  By virtue of their oversized status, each of them was accompanied by two pilot cars, one in front and one in back.  Id.

In order to alert the Northwest drivers to possible overhead obstructions, the pilot car in front of each of the two trucks was equipped with a high pole rising about two to six

inches above the height of the oversized load, which put the pilot's overall clearance height at between 15'8" and 16'.  Id.; McCutcheon Dep. at 17; Deposition of Mitchell Gerlaugh ("Gerlaugh Dep.") at 16.[1]  Mitchell Gerlaugh drove the lead pilot car, which was the first vehicle in the Northwest convoy to approach what became the accident scene, between mile markers 8 and 9.  Compl. at ¶ 5; Gerlaugh Dep. at 16.  Gerlaugh had seventeen years of experience.  Gerlaugh Dep. at 17.

Gerlaugh traveled a quarter to a half mile in front of McCutcheon's load, according to himself, and three-quarters of a mile in front, according to McCutcheon.  Gerlaugh Dep. at 17; McCutcheon Dep. at 25.  There was clear communication among all the members of the escort group on channel 23 of the radio. Gerlaugh Dep. at 20.  The trouble came from overarching cables suspended from poles, consisting of a fiber optic cable owned by Windstream Communications and the electric AEP cable.  Gerlaugh testifies that his high pole tipped the fiber optic cable, almost two feet down (i.e., well below McCutcheon's clearance). Gerlaugh Dep. at 21.  Upon this contact, Gerlaugh says that he notified McCutcheon by radio and "to my recollection, I informed him that the way the wire was sagging, it was higher to the

---

[1] Although the exact height of the high pole is not material to this case, plaintiffs rely on, and defendants do not dispute, Gerlaugh's higher estimate.  In fact, Gerlaugh claims that the law requires the high pole to be six inches higher than the oversized load.  Gerlaugh Dep. at 16.

right.  And if he had gone – to go right to the shoulder."  Id. at 21.

McCutcheon, in what plaintiffs regard as a self-serving false recollection, tells a different story.  He remembers Gerlaugh telling him over the radio that the wire looked "a little low to the right" but that Gerlaugh had nonetheless cleared it with his pole and had suggested that McCutcheon might want to move over to the fast lane.  McCutcheon Dep. at 24.  Moreover, McCutcheon recalls that Gerlaugh told the drivers on the radio "that we were fine" and "to not worry about it."  Id. at 23, 25.  In his pilot car's rearview mirror, Gerlaugh saw that McCutcheon was driving in the opposite lane of the one he says he had advised but did not have time to inform McCutcheon of the error before the latter struck the wire.  Gerlaugh Dep. at 63.  On cross-examination, Gerlaugh admits that while he had helped spot an obstacle by stopping his pilot car in the past, he did not stop on that occasion, nor did he instruct anyone else to stop.  Id. at 54.  Instead, he remembers informing McCutcheon that he had tipped the wire with his pole and that it "was higher on the right," at which point it became "up to him, my driver, to ascertain what he needs to do to clear that obstruction."  Id. at 53-54.

McCutcheon says he drew some false comfort from having driven this very route only three days earlier, presumably without tipping the Windstream cable.  McCutcheon Dep. at 26.

He testifies that he also had difficulty visually ascertaining that the cable was too low for his load to clear.  Id.  In addition, McCutcheon was aware that a lot of other oversized loads were passing through that stretch of the highway to serve the burgeoning oil and natural gas industry in the northern part of the state.  Id. at 42-43.

McCutcheon struck the cable, at a speed of 55 to 60 miles per hour.  Id. at 27.  While plaintiffs maintain that McCutcheon's load struck the Windstream cable, Pffs. Memo. at 5-6, McCutcheon remembers hitting the "power line," McCutcheon Dep. at 24, 27.  His back pilot car driver, following a mere car length behind, reported that McCutcheon's truck "ripped . . . down" the cable, which struck McCutcheon's back pilot car.  Id. Glass, traveling between one-half and three-quarters of a mile behind McCutcheon but on the same collective radio transmission, heard the same report, presumably from McCutcheon's back pilot driver, "You took it down.  You hit the wire.  You hit the wire."  Glass Dep. at 21.  By the time Glass approached the treacherous wires, the Windstream cable was on the ground and the AEP cable came to sag dangerously low because the poles, from which both cables were suspended, became destabilized by the impact of McCutcheon's truck.  Glass Dep. at 21; Pffs. Memo. at 5-6.

Glass came to a halt on the right side of the highway (not quite able to fully position his oversized truck in the

shoulder before he had to stop because of the obstacle posed by
the wires) and was "sitting there determining what to do next,
because we still had a very little wire hanging over the
interstate . . ." Glass Dep. at 21-22. At that time, Thomas
approached in his truck and switched into the left (passing)
lane, unaware of the danger. Thomas Statement. When Thomas's
vehicle struck the AEP cable, he was situated between Glass's
truck and Glass's accompanying pilot car. Deposition of Larry
L. Thomas of October 3, 2016 ("Thomas Dep. I") at 68; Thomas
Statement. Thomas then pulled over onto the shoulder to assess
the situation. Id. Thomas says that he did not see the hanging
AEP cable before he hit it, Thomas Dep. I at 67, a circumstance
plaintiffs appear to attribute to the visual obstruction from
Glass's trailer that Thomas was passing on the left, Pffs. Memo.
at 6. Thomas's impact tore down the AEP cable. Thomas
Statement; Glass Dep. at 22.

        At the time Thomas pulled onto the shoulder, he was
"approximately half of a football field or more in front of the
[back] escort pilot truck." Thomas Statement. Right after he
exited his cab, he noticed an oncoming red pickup truck and
started waving his arms in an unsuccessful attempt to get the
driver's attention. Id.; Thomas Dep. I at 69-70. The pickup
struck the cables that lay sprawling in the middle of the
highway and, as it proceeded forward, entangled one or both of
them around Thomas, who was standing at the driver's side of his

vehicle, and "tossed" him up in the air.  Id.; see also Glass
Dep. at 23 (reporting that from the conversation with the red
pickup driver, Glass understood that the wire "pulled tight
around [Thomas] and . . . threw him in the air and then back
down on the shoulder in front of his truck").  As a consequence,
Thomas had trouble moving and lay bleeding on the shoulder of
the highway, as the red pickup truck driver came to render
assistance.  Thomas Dep. I at 73-74.

Thomas called his home base at Brenntag in St. Albans,
West Virginia at 9:58 a.m. and informed Mike Stepp (perhaps a
coworker or a supervisor) that he would be calling 911.  He did
so at 10:01 a.m. and was taken to the hospital when emergency
services personnel arrived.  Thomas Statement.

Shortly after the accident and before the paramedics
came, McCutcheon drove in his lead pilot car back to the scene,
to join Glass, Glass's pilot car drivers, and the pickup driver,
with all concerned about the state of the badly injured
plaintiff.  McCutcheon Dep. at 28-30; Glass Dep. at 24.  The
recollections of those fast-paced events are understandably
murky, but in any event Thomas remained conscious, and everybody
stayed at his side, as they were waiting for outside help.
According to McCutcheon's testimony, some thirty minutes may
have elapsed before the ambulance arrived.  McCutcheon Dep. at
31.  Neither of the Northwest oversized load drivers remembers
personally calling Brenntag but each believes that "someone

else" did.  Glass Dep. at 26; McCutcheon Dep. at 30.  McCutcheon
recalls that "we called to find out what they were going to do
with his truck" and were told to lock it up and leave it there
for someone from Brenntag to retrieve.  McCutcheon Dep. at 35.
"Somebody" also called 911.  Glass Dep. at 24; McCutcheon Dep.
at 30.  Then McCutcheon called 911 a second time to "make sure
that they were sending a trooper."  McCutcheon Dep. at 30.  From
Thomas's statement, we know that he called both his employer
Brenntag and 911 himself.  Thomas recalls the "oversized load"
giving him "assistance."  Thomas Dep. I at 74.

State Trooper Steven Demaske, by himself, arrived
shortly after the ambulance.  McCutcheon Dep. at 31-32.  He
adopted what the Northwest crew regarded as a somewhat unusual
tack.  First, McCutcheon "explained to him everything, the
incident, how it took place, asking him what he needed from me
as far as my paperwork or my driver's license or anything," but
Demaske "never even got out of the car, never asked me for
nothing."  McCutcheon Dep. at 32.  Trooper Demaske did ask for
McCutcheon's load's height but did not request any documentary
confirmation of the answer.  Id. at 33.  "[H]e said, well . . .
it was just an act of God or an act of nature that this
happened.  There's nothing really to be done about it.  So — and
he left, and that was it," vividly remembers McCutcheon.  Id. at
32.  Glass corroborates:

> Steve McCutche[o]n was talking to the highway
> patrol officer. I . . . walked over and was talking
> to the highway patrol officer with Steve. . . .
> [A]ll he asked us was if we were en route, what
> height was on our permit. . . .
>
> [H]e says, Aren't they [overhead wires] supposed to
> be, like, 18 or 20 foot, you know, high?
>
> And we said, Yeah, something like that.
>
> And he said, Well, it sounds like a power company
> problem to me. You guys are good to go.

Glass Dep. at 25. See also Gerlaugh Dep. at 48 ("Well, [Trooper Demaske] pulled up, asked us what had happened. And we explained what had transpired. And he just basically said, well, it was an act of God that the wire was that low on the highway. Nobody was at fault. We could carry on, go our way."). McCutcheon says he was "floored that [Trooper Demaske] doesn't even ask any questions or show any concern." McCutcheon Dep. at 34.

Before the Northwest drivers proceeded on their journey, Glass called Austin Helm, Northwest's health, environmental, and safety manager based in Tulsa, Oklahoma. Glass Dep. at 24-25. McCutcheon also called Helm even before the ambulance and Demaske came, and then called him back afterwards to report the conversation with the trooper. McCutcheon Dep. at 32, 35. Initially, Helm asked McCutcheon to fax him all the paperwork the state trooper would give him, of which there was none. Id. at 35. For his part, Helm testifies that he neither recorded his conversations with the drivers

about the incident, nor completed any accident or incident report about it, nor preserved or reviewed any trip notes, logs, or other material. Helm Dep. at 43. In a similar vein, John Mefferd, the operations manager for the heavy haul division of Northwest, testifies that until Northwest was subpoenaed by the plaintiffs, he was unaware of the facts and circumstances of the event other than Trooper Demaske's clearance and that the company did not take any further action regarding the incident. Deposition of John Mefferd ("Mefferd Dep.") at 20; Pffs. Memo. at 8, 16; Helm Dep. at 12.

Plaintiffs initially brought this lawsuit against a number of parties, including Windstream but not the present defendants, on March 21, 2016. On June 9, 2017, with the court's permission, plaintiffs filed an amended complaint, which added Northwest and its two drivers of the oversized loads. Plaintiffs represent that they "were not aware of the involvement of Northwest and its drivers when the original complaint was filed, even though they had gone to extensive lengths to identify any persons that were involved." Pffs. Memo. at 9. Over the course of this litigation, the other defendants have been dismissed; notably, Windstream settled and was dismissed on January 12, 2018.

## II.  Causes of action

After the dismissal of all other defendants, the
surviving causes of action in the amended complaint include
claims of negligence against McCutcheon (Count VIII), failure to
warn against Glass and McCutcheon (Count IX), negligence _per se_
against all (Count X), vicarious liability against Northwest
(Count XI), negligent hiring, training, and supervision against
Northwest (Count XII), and negligent infliction of emotional
distress against all (Count XIII).  Plaintiffs also request
punitive damages (Count XVI).

While the plaintiffs' motion asks for summary judgment
on all claims, defendants move for summary judgment on the
claims of failure to warn (Count IX), negligence _per se_ (Count
X), negligent hiring, training, and supervision (Count XII), and
negligent infliction of emotional distress (Count XIII), as well
as on punitive damages (Count XVI).

## III.   Legal standard

A party is entitled to summary judgment "if the
pleadings, the discovery and disclosure materials on file, and
any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law."  Fed. R. Civ. P. 56(c).  Material facts are
those necessary to establish the elements of a party's cause of

action.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248
(1986).

Summary judgment is inappropriate if the evidence is
sufficient for a reasonable fact-finder to return a verdict in
favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at 248.  Even
if there is no dispute as to the evidentiary facts, summary
judgment is also not appropriate where the ultimate factual
conclusions to be drawn are in dispute.  <u>Overstreet v. Ky. Cent.</u>
<u>Life Ins. Co.</u>, 950 F.2d 931, 937 (4th Cir. 1991).

IV.  <u>Analysis</u>

A. Plaintiffs' Motion

Plaintiffs' initial argument is that the discovery
rule should apply to toll the accrual of the statute of
limitations until at least September 22, 2016, when Windstream
filed its motion for leave to file a third-party complaint
against John Doe Trucking Company (whose identity later came to
be established as Northwest).  Pffs. Memo. at 11.  Plaintiffs
argue that given the dearth of records, they had no reason to
know of Northwest's involvement until then.  If the applicable
two-year statute of limitations were so tolled, the plaintiffs'
action against the Northwest defendants, which was brought by
the amended complaint ordered to be filed on June 9, 2017, would
be timely.  <u>Id.</u>  In support of their position on the discovery
rule, plaintiffs advance two separate, alternative arguments:

(1) that they did not know and should not have known about the cause of action against these defendants until September 22, 2016, and (2) that these defendants fraudulently concealed their identities, preventing their discovery by the plaintiffs.

Aside from the gateway issue of the statute of limitations, plaintiffs argue that there is no genuine issue of material fact regarding all their claims and ask the court to find the Northwest defendants negligent as a matter of law. Id. at 18-20. They do not extensively elaborate this argument for summary judgment by cause of action, focusing rather on the discovery rule that may, or may not, toll the applicable statute of limitations in this case. As will be seen, the court does not need to decide at this stage whether there is a genuine dispute of material fact on the negligence claims (although defendants maintain that there is such a dispute and argue that the defendants acted reasonably, Defs. Resp. at 7-10). Moreover, it would be unusual for a plaintiff to prevail on a claim of negligence as a matter of law, on summary judgment, in a case such as this.

Defendants object to granting summary judgment to the plaintiffs on any claims because they argue that these claims are time-barred by the applicable statute of limitations of two years for personal injury actions established by W. Va. Code § 55-2-12.

The court analyzed the discovery rule issue in its opinion and order granting the motion to amend the complaint on June 9, 2017, over Windstream's opposition (ECF No. 106).[2]  At the time, the court observed that a number of failures combined to prevent plaintiffs from learning about the Northwest defendants earlier, namely, the failure of Trooper Demaske to file a report, the failure of McCutcheon and Glass to provide their contact information to Thomas in what plaintiffs allege was a violation of W. Va. Code § 17C-4-3 (duty to give contact information and render aid), and the failure of Helm to file a report of the accident as required by the Federal Motor Carrier Safety Regulations ("FMCSR"), 49 C.F.R. § 390.15.  Accordingly, on June 9, 2017, the court stated, "Considering the alleged failures of Northwest to properly report its involvement, and Windstream's failure to disclose the identities of Trawick and Madison, the court finds that questions of fact exist as to whether plaintiffs' claims against Northwest, Madison, and Trawick are time-barred."  ECF No. 106 at 12.[3]

The court's previous analysis, and the parties' submissions, are naturally guided by West Virginia's law on the application of the statute of limitations and its possible

---

[2] That amendment added not only the Northwest defendants but also other defendants that have since been dismissed.  Windstream objected to the delays the amendment would occasion and the supposed futility of the new, allegedly time-barred claims.  ECF No. 97.

[3] Trawick Construction Co. and Madison Cable Co. were involved in the installation of the low-hanging cable, Trawick as a direct contractor to Windstream and Madison Cable as a subcontractor.  Compl. at ¶ 12.

tolling through the operation of the discovery rule. The West Virginia Supreme Court has explained this application as follows, enunciating a five-step test:

> We further hold that under the discovery rule set forth in Syllabus Point 4 of Gaither v. City Hosp., Inc., supra, whether a plaintiff "knows of" or "discovered" a cause of action is an objective test. The plaintiff is charged with knowledge of the factual, rather than the legal, basis for the action. This objective test focuses upon whether a reasonable prudent person would have known, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action.
>
> Finally, a five-step analysis should be applied to determine whether a cause of action is time-barred. First, the court should identify the applicable statute of limitation for each cause of action. Second, the court (or, if material questions of fact exist, the jury) should identify when the requisite elements of the cause of action occurred. Third, the discovery rule should be applied to determine when the statute of limitation began to run by determining when the plaintiff knew, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action, as set forth in Syllabus Point 4 of Gaither v. City Hosp., Inc., supra. Fourth, if the plaintiff is not entitled to the benefit of the discovery rule, then determine whether the defendant fraudulently concealed facts that prevented the plaintiff from discovering or pursuing the cause of action. Whenever a plaintiff is able to show that the defendant fraudulently concealed facts which prevented the plaintiff from discovering or pursuing the potential cause of action, the statute of limitation is tolled. And fifth, the court or the jury should determine if the statute of limitation period was arrested by some other tolling doctrine. Only the first step is purely a question of law; the resolution of steps two through five will generally involve questions of material fact that will need to be resolved by the trier of fact.

<u>Dunn v. Rockwell</u>, 225 W. Va. 43, 53, 689 S.E.2d 255, 265 (2009).
Clearly, <u>Dunn</u> urges that the court should generally submit to
the jury the question of when plaintiffs knew or should have
known of the cause of action against defendants or whether
defendants fraudulently concealed the facts giving rise thereto.

In this case, the court finds that while the relevant
facts are not disputed, different inferences can be drawn from
them, bringing the matter outside the narrow category that would
permit it to be resolved as a matter of law.  In reaching this
conclusion, the court has examined the two alternative grounds
plaintiffs invoke: the traditional discovery rule (third step of
<u>Dunn</u>, <u>supra</u>) and fraudulent concealment (fourth step).

In an attempt to bring their claims within the ambit
of the traditional discovery rule, plaintiffs rely on <u>Gaither v.
City Hosp., Inc.</u>, 487 S.E.2d 901 (W. Va. 1997) where the court
declined to find that a medical malpractice claim was time-
barred as a matter of law, when the patient had no reason to
suspect that something was amiss with his treatment until he was
put on notice of it.  Plaintiffs point out that the only
Northwest vehicle within Thomas's sight was Glass's, and Thomas
knew that Glass had not hit the wire.  He only learned of
McCutcheon's existence when the latter came back to render
assistance and had no reason to question his identity because he
was in a state of shock.  Then, because of a lack of

investigation and reporting by Northwest, the plaintiffs say they did not discover the additional (Northwest) tortfeasors in spite of their diligent efforts.  Pffs. Memo. at 13-17.  On the other hand, defendants contend that they tried without success to provide their information to the state trooper at the scene and could not have provided it to Thomas because of his condition.  Defs. Resp. at 6.

The injured Thomas, who called his employer Brenntag and 911 at the scene of the accident, also spoke with McCutcheon and Glass at the scene and was at least on notice of their presence, if not of their exact role in the events.  One of the Northwest people also called Brenntag from the scene.  A question of fact remains as to whether the plaintiffs should have discovered the defendants' involvement sooner than they did, and whether they should have investigated the matter to establish the identity of the trucking company before they were prompted to do so by Windstream's third-party claim.

A similar result obtains when it comes to the fraudulent concealment argument.  Inasmuch as McCutcheon called 911, McCutcheon Dep. at 30, and he and Glass tried to help the plaintiff at the scene, cooperated with the state trooper at the scene, called Thomas's employer, Brenntag, and followed its instructions to lock Thomas's truck, and left the scene only after the plaintiff was taken to the hospital, these defendants cannot be said to have engaged in a cover-up <u>as a matter of law,</u>

which is required to meet this prong of the discovery rule, Sattler v. Bailey, 400 S.E.2d 220, 229 (W. Va. 1990). To be sure, there is an argument that defendants did not discharge all their responsibilities under the relevant laws when it came to reporting and record-keeping, but the fact finder can plausibly find that there was no "affirmative concealment," Sattler, 400 S.E.2d at 229.

As the foregoing shows, because there is a dispute of material fact as to whether all of their claims are time-barred, the plaintiffs' motion for summary judgment is denied. With this resolution, the court turns to the defendants' more circumscribed request.

### B. Defendants' Motion

#### 1. Count IX.   Failure to warn

Defendants argue that McCutcheon had driven too far beyond the cable he had struck for him to be able to give any warning and that Glass acted reasonably under the circumstances inasmuch as he was himself only just stopping when Thomas's truck passed on the left. In addition, defendants point out that Thomas was on notice of a potential emergency when he switched into the left lane just as Glass was pulling over onto the right shoulder. Defs. Memo. at 7-8 quoting Deposition of Larry L. Thomas of March 29, 2018 ("Thomas Dep. II") at 29-31.

Q: Okay. And as a CDL driver, what does that [Glass pulling over onto the shoulder] mean to you?

A: It's either checking your load, it could be an emergency situation, basic clearing the highway . . .

Thomas Dep. II at 30 quoted in Defs. Memo. at 8. Defendants also argue that Glass did not know that the wire was in the roadway until after he drove, in his lead pilot's car, to the location where Thomas's truck had stopped, just up the road. Defs. Memo. at 9; Glass Dep. at 22, 64. Defendants add that Glass testified, "I want to say that my rear escort, you know, they got out and started flagging traffic around." Glass Dep. at 56 quoted in Defs. Memo. at 9.

Plaintiffs in response claim that given the supposed distances between the vehicles, it does not make sense that Glass was stopping right before the cable and did not have time to do anything else, such as warn traffic. To them, this "begs the question of just how much distance was between all of the oversized loads and their pilot cars and, consequently, whether Mr. McCutchen [sic] and Mr. Glass further breached the duty to maintain the appropriate distance." Pffs. Resp. at 6. Plaintiffs contend further that if the proper distances between the vehicles had been observed (one mile between Gerlaugh and Glass according to their testimonies), Glass should have been able to stop sooner, and warn oncoming traffic. Plaintiffs urge that the duty to warn applied with equal force not only with

respect to Thomas but also to other drivers, most relevantly the driver of the red pickup truck that injured him.

Defendants' arguments about insufficiency of time and reasonable actions under the circumstances apply about as much to any claim of failure to warn the red pickup driver as they do to the failure to warn Thomas.  In addition, as defendants assert, Defs. Rep. at 3, Thomas testified that the whole incident transpired in "seconds."  Thomas Dep. II at 71.  Defendants further note that Glass wasn't sure that there was a wire across the interstate, Glass Dep. at 63-64, and was wondering what to do next, "I was trying to either figure out a way to back up so that I didn't have anybody strike me in the rear or, you know, hit me in the side or anything because of my width," id. at 22.  Defs. Rep. at 2.  On the other hand, Glass testifies that "by the time I got to the wire . . . there was part laying on the ground."  Glass Dep. at 21.

Defendants also point to what they represent to be the testimony of their retained transportation safety expert, Jerry Pigman, P.E., that "[t]he dynamics of the events indicate an absence of sufficient time for Mr. Glass to initiate any form of emergency response which could have benefited Mr. Thomas as he approached and passed Glass' truck before contact with the low hanging wire."  Defs. Rep. at 2.[4]  As defendants note, failure to

---

[4] While defendants ostensibly quote ECF No. 194, the court does not see Mr. Pigman's report under that docket number.

warn is at bottom a negligence action.  Defs. Memo. at 6 citing
Harris v. Matherly Mach., 187 W. Va. 234, 237 (1992).

Given the different inferences the parties may draw,
there is a genuine dispute of material fact on the failure to
warn claim, rendering summary judgment not appropriate on Count
IX.

### 2. Count X.  Negligence per se

Defendants aptly argue that the statute that requires
providing contact information by a driver involved in a crash,
W. Va. Code § 17C-4-3, cannot serve as a predicate for a
negligence per se claim because it is "not a safety statute for
which a violation constitutes prima facie evidence of
negligence, and because any alleged violation of the statute was
not the proximate cause of Thomas' injuries."  Defs. Memo. at
11.

In response, plaintiffs do not dispute the defendants'
contention but instead undertake to refashion their claim as one
for fraudulent concealment, rather than negligence per se.  In a
footnote, plaintiffs state: "If the discovery rule applies to
this matter, as Plaintiffs contend, then Plaintiffs could amend
their Complaint to add a count for fraud, as the statute of
limitations would not yet have expired.  However, Plaintiffs
believe that Count X could properly be a claim for fraud."
Pffs. Resp. at 8 n. 7.

The amended complaint contains "no mention of fraud, fraudulent concealment, or even a discussion of the particular circumstances allegedly constituting fraud by Defendants." Defs. Resp. at 5; Compl., Count X. Nevertheless, given the essential simplicity of the allegation — that defendants did not communicate their contact information and also failed to record the incident — the court need not dismiss the revised claim on this ground at this juncture.

The court agrees with the defendants that there is no evidence to support a negligence <u>per se</u> claim, as plaintiffs all but concede in their late-hour attempt to recast Count X into an entirely different cause of action. The court thus proceeds to assess the evidentiary posture of the newly proposed fraudulent concealment claim, which plaintiffs argue Count X should be construed as being. Pffs. Resp. at 8-11.

In order to establish fraud, the party must prove the following elements:

> (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied on it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied on it.

<u>Kessel v. Leavitt</u>, 511 S.E.2d 720, 752 (W. Va. 1998) (citations omitted), quoted in Pffs. Resp. at 9. Under some circumstances, fraud can be "constructive" in the absence of an intent to

defraud.  Stanley v. Sewell Coal Co., 285 S.E.2d 679, 683 (W.
Va. 1981).

The state Supreme Court has explained in Kessel that
fraudulent concealment entails "deliberate nondisclosure
designed to prevent another from learning the truth."  511
S.E.2d at 752 (quotation omitted), quoted in Pffs. Resp. at 9.
As defendants observe, Defs. Resp. at 6, mere silence is
ordinarily insufficient to sustain a fraudulent concealment
claim.  Merrill v. W. Va. Dep't of Health & Human Res., 632
S.E.2d 307, 325 (W. Va. 2006).

Plaintiffs base their claim of fraudulent concealment
on the fact that the defendants "failed to provide anyone with
any contact information or information regarding the accident."
Pffs. Resp. at 10.  Moreover, plaintiffs emphasize that
defendants did not investigate or report this accident in any
manner and did not generate "one piece of information regarding
the accident."  Id. at 10-11.  Although these contentions are
principally predicated on a common law analysis of fraud, with
its requisite elements, they purportedly also draw support from
two statutory or regulatory violations plaintiffs suggest that
defendants committed: West Virginia Code § 17C-4-3(a) and 49
C.F.R. § 390.15 of the Federal Motor Carrier Safety Regulations.

The state statutory provision reads as follows:

> (a)(1) The driver of any vehicle involved in a crash
> resulting in injury to or death of any person or

damage to any vehicle which is driven or attended by any person shall, if physically able to do so, provide to the person struck or the driver or occupant of or person attending any vehicle collided with, the following:

(A) His or her name, a valid telephone number where he or she may be contacted and the year, make, model and last four digits of the vehicle identification number of the vehicle he or she is driving; and

(B) Proof of security and financial responsibility required by section three, article two-a, and section two, article four, chapter seventeen-d of this code, and if provided by insurance, the information provided upon the certificate of insurance, including the name of the insured, the name and contact information of the insurer and insurance policy number.

(2) A driver may meet the requirements of this subsection by providing the information required herein to a law-enforcement officer who is investigating or providing assistance at the scene of the collision, who shall, if practical under the circumstances, provide the information to any person entitled thereto pursuant to this subsection.

W. Va. Code Ann. § 17C-4-3 (West). Assuming their involvement in a "crash," it is undisputed that the Northwest people did not provide the contact information specified in W. Va. Code § 17C-4-3(a)(1)(A) to either Thomas or to a law-enforcement officer, per § 17C-4-3(a)(2). Plaintiffs focus on the auxiliary verb "may" in that latter provision to suggest that even though Trooper Demaske showed no interest in investigating the accident or obtaining any information respecting it, defendants remained under a duty to provide contact information to Thomas, which duty they allegedly failed to discharge. Though such a reading has merit as a matter of statutory interpretation, the court

accords it little weight as a predicate for a fraudulent concealment claim under the circumstances here. In addition to the Northwest drivers' calling 911 and their undisputed cooperation at the scene with Trooper Demaske who assessed the event as an "act of God" and told them they were "good to go," they called Brenntag to alert it to pick up Thomas's truck and then locked the truck as Brenntag requested. These actions plainly undercut the viability of any fraudulent concealment claim, which requires a "deliberate nondisclosure."

What is more, the court does not discern evidence of a violation of § 390.15 insofar as it pertains to any obligation to provide information to investigators. In that respect, the regulation reads as follows:

> (a) Each motor carrier and intermodal equipment provider must do the following:
>
> (1) Make all records and information pertaining to an accident available to an authorized representative or special agent of the Federal Motor Carrier Safety Administration, an authorized State or local enforcement agency representative, or authorized third party representative within such time as the request or investigation may specify.
>
> (2) Give an authorized representative all reasonable assistance in the investigation of any accident, including providing a full, true, and correct response to any question of the inquiry.

49 C.F.R. § 390.15. It is plain that defendants complied with this regulation when they cooperated with Trooper Demaske

inasmuch as it is undisputed that no other investigation was ever undertaken by any authorities.

Plaintiffs' quest to anchor their claim in part in Austin Helm's failure to investigate and record the accident is similarly unavailing.  The relevant portion of § 390.15 states:

> (b) Motor carriers must maintain an accident register for 3 years after the date of each accident.  Information placed in the accident register must contain at least the following:
>
> (1) A list of accidents as defined at § 390.5 of this chapter containing for each accident:
>
> (i) Date of accident.
>
> (ii) City or town, or most near, where the accident occurred and the State where the accident occurred.
>
> (iii) Driver Name.
>
> (iv) Number of injuries.
>
> (v) Number of fatalities.
>
> (vi) Whether hazardous materials, other than fuel spilled from the fuel tanks of motor vehicle involved in the accident, were released.
>
> (2) Copies of all accident reports required by State or other governmental entities or insurers.

49 C.F.R. § 390.15.

The regulatory definition of a recordable "accident," to the extent pertinent here, is

> (1)  .  .  .  an occurrence involving a commercial motor vehicle operating on a highway in interstate or intrastate commerce which results in:
>
> * * *

>    (ii) Bodily injury to a person who, as a result of
>    the injury, immediately receives medical treatment
>    away from the scene of the accident . . .

49 C.F.R. § 390.5.

Helm testifies that he made the decision not to record the matter as an accident based on Trooper Demaske's representations. Helm Dep. at 31-32. Helm says that he interpreted the word "occurrence" in the definition of an accident in the FMCSR as an "at-fault incident." Id. at 30. Perhaps so. But the definition does not require either a recording party or the other party to the accident to be at fault nor does it require a collision with another vehicle.

Nevertheless, an argument predicated on a violation of this provision of the FMCSR, 49 C.F.R. § 390.15(b), does not help the plaintiffs' position. Plaintiffs do not explain how a record of the accident on the register would have helped them because, as noted immediately above, reporting obligations under § 390.15 are only operative when an investigator requests the information, and the investigation by Trooper Demaske was quite perfunctory. They found Northwest through state oversized load permit records; it is rather implausible to think that Northwest's internal register would have been a better source of intelligence. Yet reliance, which is absent here, is an essential element of a fraud claim. Syl. Pt. 1, Lengyel v. Lint, 280 S.E.2d 66, 67 (W. Va. 1981).

Plaintiffs' failure to discover these defendants' role sooner is not a sufficient ground for their claim of fraud.  For the foregoing reasons, the court finds that plaintiffs have not presented evidence sufficient for the jury to consider their claim of fraudulent concealment.  Accordingly, defendants are entitled to summary judgment on Count X.

### 3. Count XII.  Negligent hiring, training, and supervision

Defendants contend that facts do not support liability on the grounds of negligent hiring, training, and supervision. Plaintiffs counter that there is no evidence of whether Northwest conducted a reasonable investigation into its drivers' backgrounds, Pffs. Resp. at 13, but that does not suffice to establish a claim of negligent hiring.

Further, plaintiffs claim that training was inadequate because during their biweekly meetings, drivers were not specifically trained on how to handle the responsibilities of their specific jobs.  Id. quoting Mefferd Dep. at 22.  They cite Pruitt v. W. Va. Dept. of Public Safety, 664 S.E.2d 175, 182-83 (W. Va. 2008), a case in which a state trooper may not have received training on when to stop firing his gun.  But this case is distinguishable: nobody is claiming that McCutcheon did not know whether or not he should drive straight into a low-hanging wire overhead after being warned by his lead pilot driver.  In

addition, the very passage plaintiffs quote suggests that
training did extend to issues that came up in practice, namely,
"we use those meetings to . . . discuss any issues that have
arisen. . ."  Pffs. Resp. at 13 quoting Mefferd Dep. at 22.
There is no evidence of negligent training in this case.

The same applies to negligent supervision.  Plaintiffs
evidently take exception to Helm's instructions to speak with
the state trooper, comply with his directives, and then proceed,
but do not say what McCutcheon and Glass should have done
instead and in what ways these instructions constituted
"negligent supervision."

Tellingly, defendants report that they served an
interrogatory to plaintiffs asking them to "[i]dentify, in
detail, any and all acts or omissions on the part of the
Defendants which you contend support your claims of negligent
hiring, negligent supervision, and negligent training against
Defendants."  Defs. Memo. at 14 quoting Defs. Ex. 7, Plaintiffs'
Responses to Northwest's First Set of Discovery Requests, at No.
22.  The plaintiffs' response merely directed defendants to
plaintiffs' amended complaint, all depositions taken, and all
motions and replies to motions filed as of the date of the
responses.  Id.

Defendants are entitled to summary judgment on Count
XII.

### 4. Count XIII.  Negligent infliction of emotional distress

Defendants move for summary judgment on this claim because, they maintain, neither plaintiff witnessed a closely related person suffer critical injury or death, which they regard as a predicate for a claim of negligent infliction of emotional distress.  Defs. Memo. at 14.

The briefing focuses on the claim for Sandy Thomas inasmuch as such a claim for Larry Thomas is indistinguishable from a recovery for emotional damages as part of his principal negligence claim.  Accordingly, the court only discusses the motion for summary judgment concerning the emotional distress of Mrs. Thomas.

It is undisputed that Mrs. Thomas was nowhere near the scene of the accident and learned about it at her home when her badly injured husband called her on the telephone.  Deposition of Sandy Thomas at 22.  The West Virginia Supreme Court has observed: "[W]e too adopt the requirement that a plaintiff in a negligent infliction of emotional distress action is present at the scene of the injury-producing event at the time it occurs and is aware that it is causing injury to the victim."  Heldreth v. Marrs, 425 S.E.2d 157, 164 (W. Va. 1992).  Under Heldreth, the following factors must be evaluated: (1) plaintiff's relationship to the victim, (2) whether plaintiff was at the scene of the accident and aware of the injury, (3) extent of

injury (or death) of the victim, and (4) whether plaintiff suffered serious emotional distress.  Syl. Pt. 2, id. at 159.

Plaintiffs assert that their claim is not predicated on Heldreth and instead rely on what they characterize as a "broadening" of the negligent infliction doctrine in a case decided four days later, Ricottilli v. Summersville Memorial Hospital, 425 S.E.2d 629 (W. Va. 1992).  Pffs. Resp. at 14. That case involved problems with an autopsy report of the appellant's daughter that prevented the appellant from proceeding with genetic testing for possible diseases affecting her other children.  Id. at 635.  There, the court held that an individual may recover for negligent infliction of emotional distress upon "a showing of facts sufficient to guarantee that the emotional damages claim is not spurious."  Syl. Pt. 2, id. at 629.  Understandably, plaintiffs seize on that point, yet the standard is not infinitely elastic, and Ricottilli did nothing to abrogate Heldreth.  The Ricottilli holding appears to be limited inasmuch as the court emphasizes its connection to the line of cases involving inappropriate handling of corpses (which has been held to give rise to a negligent infliction of emotional distress claim).  As Judge Berger in this district explained in a recent opinion, Ricottilli was inapposite in that case inasmuch as it involved a special "'dead body exception,' [which] permits recovery for emotional damages upon proof of the negligent mishandling of a corpse."  Ali v. Raleigh Cty., No.

5:17-CV-03386, 2018 WL 1582722, at *12 (S.D.W. Va. Mar. 29, 2018) (quoting Ricottilli, 425 S.E.2d at 634).

Plaintiffs cite Marlin v. Bill Rich Construction, 482 S.E.2d 620 (W. Va. 1996), involving workers who were allowed to recover for negligent infliction of emotional distress as a result of having been exposed to asbestos and who feared that they would contract occupational pneumoconiosis, a circumstance quite distinguishable from that of Mrs. Thomas. The other cases plaintiffs cite, Mace v. Charleston Area Medical Center Foundation, Inc., 422 S.E.2d 624 (W. Va. 1992), Page v. Columbia Natural Resources, 480 S.E.2d 817 (W. Va. 1997), and Rodriguez v. Consolidation Coal Co., 524 S.E.2d 672 (W. Va. 1999), all involve recovery for emotional distress in employment contexts where no physical injuries occurred, and therefore constitute a distinct line of cases from those sounding in the "bystander theory" of negligent infliction liability under Heldreth.

A subsequent decision restated the holding of Heldreth by noting that "a plaintiff in a negligent infliction of emotional distress action must be present at the scene of the injury-producing event at the time it occurs and must be aware that it is causing injury to the victim." Stump v. Ashland, Inc., 499 S.E.2d 41, 47 (W. Va. 1997). In that case, recovery was allowed for children who did not witness a tanker hit their house and set it ablaze but remained outside as their parents burned to death as a consequence of the impact. Id. However, in this modest extension,

the court took pains to underscore the "sensory observation" requirement of <u>Heldreth</u>, <u>id.</u>, and to note the distinctive nature of fire in its holding:  "it is not necessary that the plaintiff actually witness the injury being inflicted to the victim by the fire, provided the plaintiff is at the scene of the fire and is sensorially aware, in some important way, of the fire and the necessarily inflicted injury to the victim," <u>id.</u> at 49.  <u>See also</u> <u>B.E. v. Mount Hope High Sch.</u>, No. 2:11-CV-00679, 2012 WL 3580190, at *10 (S.D.W. Va. Aug. 17, 2012) (invoking <u>Heldreth</u> and <u>Stump</u> to deny negligent infliction recovery to the parents of an underage victim of sexual assault because they "were not present at the scene of the injury-producing event").

Inasmuch as the court does not believe that the state Supreme Court would extend <u>Ricottilli</u> in the fashion suggested by the plaintiffs, defendants are entitled to summary judgment on Count XIII as to Mrs. Thomas who was not at the scene.

### 5. <u>Count XVI.  Punitive damages</u>

Defendants note that in order for a plaintiff to obtain punitive or exemplary damages, the defendant has to act "wantonly or oppressively" or with "malice," and that a "guilty intention" is required.  Defs. Memo. at 15 quoting <u>Mayer v. Frobe</u>, 22 S.E. 58, 59 (W. Va. 1895).

Plaintiffs assert that this case satisfies that criterion.  In particular, they cite McCutcheon "willfully,

wantonly and recklessly" proceeding without taking the time to assess the obstacle, Glass not stopping his truck more quickly and failure to warn traffic, and their failure to provide contact information to either the trooper who didn't want it or the plaintiff who lay injured on the shoulder of the highway, as instances of defendants' behavior that are supposed to anchor the request for punitive damages. Pffs. Resp. at 17-19. Plaintiffs' rhetorical boldness with respect to their quest for punitive damages is not matched with either evidentiary or precedential support.

It is settled law that punitive damages are not available for compensation for ordinary negligence claims as in this case but are reserved for "egregious conduct" or malicious defendants. See Harless v. First Nat'l Bank in Fairmont, 289 S.E.2d 692, 702-03 (W. Va. 1982) (citing Syl. Pt. 1, O'Brien v. Snodgrass, 16 S.E.2d 621 (W. Va. 1941); Hensley v. Erie Insurance Co., 283 S.E.2d 227 (W. Va. 1981)). Defendants are entitled to summary judgment on Count XVI.

V.  Conclusion

For the foregoing reasons, it is ORDERED:

1. That the plaintiffs' motion for summary judgment
   be, and it hereby is, denied; and

2. That the defendants' motion for partial summary
   judgment be, and it hereby is, granted as to Counts
   X, XII, XIII, and XVI of the amended complaint
   which are hereby dismissed and stricken; and denied
   as to Count IX.

The Clerk is directed to forward copies of this
written opinion and order to all counsel of record.

ENTER: July 23, 2018

John T. Copenhaver, Jr.
United States District Judge